ALSTORES REALTY, INC. v. STATE, COUNTY OF HENNEPIN.

176 N. W. (2d) 112.

March 20, 1970—No. 41708.

*Johnson & Eastlund, George R. Johnson,* and *Douglas J. Carney,* for appellant.

*George M. Scott,* County Attorney, and *David E. Mikkelson,* Assistant County Attorney, for respondents.

Heard before Knutson, C. J., and Nelson, Murphy, Otis, and Frank T. Gallagher, JJ.

MURPHY, JUSTICE.

This is an appeal from an order of the district court denying petitioner's motion for a new trial in proceedings instituted by petition for review of 1966 real property tax assessments pursuant to Minn. St. 278.01. Petitioner contends that the assessor's determination of value of the property for tax purposes is in error in that it fails to take into consideration factors relating to market value, as reflected by sales of comparable property, income or return on the owner's investment, and cost of replacement. Petitioner also contends that the trial court's reduction of the appraiser's valuation for tax purposes in the sum of $75,000 is unfair and wholly inadequate.

From the record it appears that petitioner, Alstores Realty, Inc., owns a 15-acre tract in an 80-acre shopping center complex, Southdale Shopping Center, which is located in the village of Edina. Alstores acquired its interest in 1954 and 1955 from the Dayton Company. While petitioner carries the cost of this purchase on its books as a nominal $1 consideration, there is evidence in the record of additional consideration. Petitioner put up a 4-story structure on this land, which it has used in the operation of a department store since the latter part of 1956. The

original cost of the building was $2,468,993. In 1961, the basement level was developed at an additional cost of $228,663. A car-care center and a garden center were later added at $58,226 and $22,773, respectively.

Alstores Realty, Inc., is a wholly-owned subsidiary of Allied Central Corporation, a national chain of department stores which operates locally as Donaldson's. In 1966, the year with which we are concerned, Donaldson's Southdale grossed between $9.3 and $9.4 million. The land was purchased subject to a restrictive covenant which requires its use as a department store for a period of 35 years. The land not encompassed by the building is devoted primarily to parking facilities which, by virtue of contracts and ordinances, is required to be maintained at 6 parking spaces per 1,000 feet. The parking area actually will hold between 1,200 and 1,500 cars.

Ordinarily, three methods are employed in evaluating commercial property for tax purposes. They include economic or income analysis, cost of replacement, and the market approach. The income method attempts to determine valuation on the basis of a capitalization of income in relation to investment. As the term suggests, the cost of replacement approach attempts to establish value on the basis of the sum which would necessarily be expended to replace the structure. The third method, the market approach, determines value in relation to sales of comparable property.

The evidence disclosed a great disparity between the assessor's values and those of the petitioner's appraisers. The assessor was obviously conservative in his appraisal of the building. He appraised it at $1,545,675 as opposed to the petitioner's appraisal of $1,676,600. A greater difference occurred in the valuation of the land, which the assessor established at $1,215,200, as opposed to the petitioner's valuation of $653,400. In support of its petition, Alstores called four witnesses. The first two were executives of the Allied Central Corporation. They testified that they considered petitioner's property had a value of $2.2 million. Peti-

tioner's main witness was Howard C. Shenehon, a qualified professional appraiser and experienced witness. In arriving at his appraised value he utilized the income approach with respect to the land and buildings, the market approach with respect to the land, and the cost approach with respect to the structures.

In his estimation based on the income approach, he utilized a projected lease figure of $187,400, which was equivalent to 2 percent of petitioner's gross sales. He testified that such a percentage is a standard rental and he had compared it to 17 comparable properties. By use of what he considered a fomula accepted by investors to arrive at a capitalization on the basis of income, he determined that $2.3 million was a fair valuation for the land and property.

He then used the cost approach by considering the construction costs of several department stores, cost data from national information services available to appraisers, and the actual cost figures. He assumed there had been a 40-percent depreciation of the property, and he allowed for a 10-percent increase in building costs.

His market approach included sales of 24 tracts of land, 22 of which were in the Twin City area, and 2 of which were in Rochester. The size of these parcels varied from 8.76 acres to 486 acres. They differed in important respects. They were not the same type of land with the same type of zoning, and the shopping areas were not of the same quality as to price and variety of merchandise. One of the petitioner's executives referred to Southdale Shopping Center as "number one" in 1966 of the three prime locations in the metropolitan area from the standpoint of "[l]ocation, know-how, a great many factors." Moreover, the largest tracts included in the petitioner's comparables were assembled through numerous purchases. Petitioner's valuation of the land was $653,400 or $1 per square foot. Petitioner's final witness, Charles M. Upham, corroborated Shenehon's testimony that the normal department store percentage rental lease commanded 1 1/2 to 2 1/2 percent of gross sales.

While the assessor testified that he considered all three approaches in arriving at his assessment, it is clearly evident from his testimony that, although he considered the reproduction approach with respect to the buildings, he relied entirely upon the market approach with respect to the land. In arriving at the value of the land, he depended upon his knowledge and experience as well as records of real estate transactions in the area. In answer to the question, "* * * you do attempt in your assessments of your property in Edina to equalize it one to another?", he answered:

"Well, we attempt to secure all of the sales that we can that are occurring in our area and relate them to the particular parcel of real estate that has been transferred from one owner to another, and for how much and what date and how large an area that might be; what the local zoning is on the various parcels and so forth to attempt to keep up the market."

He also testified:

"We attempt to gather all of the revenue, warranty deed sheets that show the revenue stamps. We obtain multiple listing, sales offerings and listings; all of this type of stuff."

He testified that he confirms current sales to the best of his ability and that when he became assessor of Edina in 1959 he started a card index of property transfers in his area. On direct examination, he said he used this information in determining market value, but on cross-examination he could give only two comparables that he used. They included sales of two parcels of land in the vicinity of the Southdale Shopping Center. One involved 2.5 acres sold on August 18, 1965, while the other involved 2 acres transferred on September 6, 1962.

In determining the value of the property by the cost approach, the assessor used figures found on a card in his files. These figures, the assessor assumed, "were costs as used by the State Tax Department in the original appraisal of Southdale." It appears that the original records of the State Tax Department from

which this information was taken were not available, and no attempt was made to reconstruct the figures. By applying a 2 1/2-percent-per-year depreciation rate to the original cost figures found in his office, he arrived at the present value.

We have not attempted to set out in detail the elaborate formulae of professional standards and criteria used by petitioner's appraisers in reaching the figures they assert to be the fair value of the property. It is sufficient to say that the evidence was carefully reviewed by the trial court in a memorandum which contains, in part, the following analysis and conclusions:

"After carefully studying the testimony of Mr. Shenehon [petitioner's appraiser] and Mr. Kearns [village assessor], and reviewing the testimony of Messrs. Humphrey, Brouillette and Upham [petitioner's appraisers], I find that the Petitioners come up with a figure of $1,676,660.00 as the reasonable market value of the developments on the subject property. The assessment made as reflected by the County Auditor's records as to developments was $1,545,675.00 which was $130,925.00 less than the figures of Mr. Shenehon. Therefore, I need not concern myself with this discrepancy because if the State assessed the developments less than the Petitioners, the Petitioners have no complaint coming.

"The fact that Mr. Kearns took the figures on developments from the cards that were part of the assessor's records before Mr. Kearns took charge, the fact they may have been copied from the State assessor's office would be immaterial if in the final analysis the result of the market value of the developments were less than that testified by Mr. Shenehon in the sum of $130,925.00. This reasoning is also applicable as to the manner reached such as the approaches in determining the market value of the developments.

"The matter of the appraisal of the land gives me much concern. I find from studying the transcript and the exhibits that there is a difference between the appraisal of land by Mr. Shenehon and Mr. Kearns of $561,800.00 as Mr. Shenehon testi-

fied that the value of the land as did Mr. Brouillette was $653,400.00 while the assessment showed the market value to be $1,215,200.00."

It appears that the trial court recognized the deficiencies in the assessor's appraisal and made allowance for them in his final determination. After examining the long transcript of the evidence, the trial court observed that the appraisals made by the petitioner—

"* * * were elaborate, thorough and exhausting. They went deeply into the economics, the cost of reproduction, and the market approach. In the economic approach they showed the gross sales for several years before the target date of January 2, 1966. They went into the rental values of leased premises, the national as well as the local averages for market centers. They used several manuals that were published by different organizations. They employed one of the best appraisers in this locality and he did a masterful job of making his analysis of market values. Upon the other hand, the assessor's appraisal in regard to developments was not very satisfactory. He could have procured the actual cost figures from the Donaldson Company but he chose only to use manuals. He used a two and one half percent per year in figuring depreciation and took nothing off for obsolescence depreciation while Mr. Shenehon used four percent. He figured the initial buildings to be nine years old while the testimony was quite conclusive that they were about ten years old. In the economic approach he did not get the gross sales nor did he do much in attempting to procure knowledge on rentals."

■ Petitioner's principal contention relates to the asserted failure of the assessor to fully employ the income approach as a factor in arriving at value. It would appear that the assessor discounted the value of this approach because the lease arrangement was one between members of a corporate family. Moreover, the amount of income would necessarily depend upon the quality of the management. While this asserted deficiency is pressed by

petitioner, it would appear from the record that its appraiser, based on similar considerations, felt obliged to qualify the propriety of this method as respects petitioner's actual rent. The trial court in his memorandum observed:

"* * * He [petitioner's appraiser] first found out what rent was received, but did not put much credence in the leases as between the related companies as they would not reflect in his opinion a true and reasonable value of rentals, but he did consider them to some extent."

While it must be conceded that the assessor's valuation of the property based upon income and cost of reproduction was inadequate in that he relied upon unverified and outdated information, we cannot agree that this vitiated the entire assessment procedure so that the court could not by its findings and order revise the assessed valuation for the purpose of giving the taxpayer the relief to which it was entitled. In making his determination, the trial court made allowances for the shortcomings of the assessor's appraisal by taking into consideration all of the evidence with reference to the elements of valuation as they were developed at the trial. There was ample evidence before the trial court to make its findings on all aspects of the assessment procedures, including income, replacement cost, and market value. In making his findings, the trial court had the benefit of exhaustive evidence and data on the subject of gross sales an established percentages applied for rental purposes on the basis of such sales.

In determining valuation for tax purposes, our statutes [1] enjoin the assessor "to value each article or description of property by itself, and at such sum or price as he believes the same to be fairly worth in money." Minn. St. 273.11. Land and structures are to be valued separately as well as the aggregate value of the property, including all structures and improvements. He is re-

---

[1] The applicable statutes, which provide guidelines for procedures to be used by the assessor, are Minn. St. 273.08, 273.11, and 273.12.

quired "to consider and give due weight to every element and factor affecting the market value" and "give due weight to lands which are comparable in character, quality, and location, to the end that all lands similarly located and improved will be assessed upon a uniform basis." § 273.12. The statutory standards with reference to methods of appraisal do no more than express criteria which the courts have announced in numerous decisions, including Schleiff v. County of Freeborn, 231 Minn. 389, 43 N. W. (2d) 265; State v. Russell-Miller Mill. Co. 182 Minn. 543, 235 N. W. 22; Kalscheuer v. State, 214 Minn. 441, 8 N. W. (2d) 624; In re Taxes of Potlach Timber Co. 160 Minn. 209, 199 N. W. 968. In Schleiff we said (231 Minn. 394, 43 N. W. [2d] 268):

"It is clear from the foregoing that the duty rests upon the assessor to determine the sale or market value of the property to be assessed, and that in determining what such market or sale value is, the duty rests upon him to take into consideration *every element and factor affecting such valuation.* These factors, we have held, include 'Location, cost of construction, cost of reproduction, purpose for which building was used, the intrinsic value or worth of the building, the price at which the owner is willing to sell, the price at which buyers who may use the property for some purpose are willing to buy, the price at which similar property, if any, has sold, and many other things * * *.' In re Delinquent Real Estate Taxes, Waseca County, 182 Minn. 543, 544, 235 N. W. 22."

■ Our authorities recognize that the value of improved real estate is affected by a variety of circumstances. In re Taxes of Potlach Lumber Co. 160 Minn. 209, 212, 199 N. W. 968, 969, expresses this test:

"* * * What will the property bring if offered for sale to a buyer desirous of purchasing property of the same general character in the same locality?"

State v. Pennsylvania Mutual Life Ins. Co. 198 Minn. 115, 120, 269 N. W. 37, 40, expresses the view that—

"* * * income is a large factor in arriving at sales value of property; it is not the sole criterion."

And, Minnesota v. Federal Reserve Bank (D. Minn.) 25 F. Supp. 14, 19, notes that while—

"* * * capitalization of income will fairly reflect taxable values, * * * there is no intimation in the statute that this method is the exclusive standard to apply. Quite the contrary appears."

More recently, in Great Plains Supply Co. v. County of Goodhue, 268 Minn. 407, 409, 129 N. W. (2d) 335, 336, we said that the factors specified in the statute "are suggested but are neither exclusive nor mandatory upon either the assessor or the factfinding court." In De Luz Homes, Inc. v. County of San Diego, 45 Cal. (2d) 546, 564, 290 P. (2d) 544, 555, it was stated that "since no one of these methods alone can be used to estimate the value of all property, the assessor * * * may exercise his discretion in using one or more of them."

While the assessor's methods of gathering information on which to base a valuation for tax purposes are not to be recommended, whatever deficiencies exist by reason of the inadequacy of the assessor's appraisal have been compensated for by the thorough and time-consuming efforts of the trial court in constructing a fair valuation on the basis of the wide range of testimony submitted to him. Moreover, we are of the view that the assessor's qualifications to express a valid appraisal of the value of the land were supported by his knowledge of land values in that particular area. In his memorandum the trial court noted the great variation between the opinions of the two principal witnesses of the opposing parties. Calling attention to the fact that the assessor's valuation of the building was $130,925 less than the appraisal of petitioner's experts and that the assessor's

valuation of the land was $531,375 in excess of the valuation of petitioner's experts, the trial court said:

"* * * Taking the two figures into consideration the combined assessment of the Auditor's office is $430,000.00 more than the experts opinion by the Petitioners. I have reduced this by $75,000.00. In other words, the Petitioners have received the amount of $205,925.00 in reduction, to wit, the mistake made by the Assessor of $130,925.00 and the decrease by my findings. The law prevents me from correcting the assessment of the developments although it is admitted by the Petitioners that it was inadequate and so I must stand on that figure and I have as shown by my findings. However, I am convinced that the land value as testified by Petitioners experts are far too inadequate and although I think the Assessor's figures are too high, I think a reduction of $75,000.00 is fair."

■ We have held that the trial court's findings of fact in a tax case, like those in ordinary civil cases, must be sustained upon review if reasonably supported by the evidence as a whole. In re Taxes of Nelson v. County of Meeker, 285 Minn. 527, 172 N. W. (2d) 753; Minnesota Power & Light Co. v. Carlton County, 275 Minn. 101, 145 N. W. (2d) 68; Kalscheuer v. State, *supra*. As was stated in Schleiff v. County of Freeborn, 231 Minn. 389, 396, 43 N. W. (2d) 265, 269:

"* * * [E]ven though it appears that the assessor did not follow the statutory mandates in arriving at the estimates of value, the trial court's findings on the issue of value must be sustained if there is other evidence to support them."

Here, the evidence as to all aspects of value was fully developed through knowledgeable witnesses by competent counsel, and the court had full factual data as to elements bearing upon income, reproduction costs, and a wide variety of testimony as to real estate value, including comparables. The weight and credibility of the testimony, including that of the expert witnesses, was for the trier of fact to determine. We are of the view that the evi-

dence reasonably supports the findings and determination of the trial court.

Affirmed.