## NORTHWEST RACQUET SWIM & HEALTH CLUBS, INC., Relator,

v.

## COUNTY OF DAKOTA, Respondent.

No. C8–96–1444.

Supreme Court of Minnesota.

Jan. 23, 1997.

Faegre and Benson LLP, Michael F. Kelly, Jr., Jason D. Topp, Minneapolis, for relator.

Kenneth A. Malvey, Asst. Dakota County Atty., Hastings, for respondent.

## OPINION

STRINGER, Justice.

Appellant Northwest Racquet, Swim and Health Clubs, Inc. ("Northwest") petitioned the tax court for review of the Dakota County Assessor's assessment that the market value of its Burnsville Racquet, Swim and Health Club (the "Burnsville Club"), as of January 2, 1993, was $6,298,700. After a three-day trial, the tax court found the fair market value of the Burnsville Club to be $7,190,000. In reaching its result, the tax court rejected Northwest's appraisal of the club based on an income allocation model and relied exclusively on the cost approach; further, it rejected Northwest's assertion that the club suffered from 50% economic obsolescence for purposes of applying the cost approach. On Northwest's petition for review, we hold that the tax court did not commit clear error in concluding that there was insufficient financial data relating specifically to the Burnsville Club to accurately determine its value through an income allocation approach or to objectively measure its economic obsolescence. We affirm.

The Burnsville Club is a health and fitness center located at 14600 Burnhaven Drive in Burnsville, Minnesota. It is one of 12 health and fitness centers in the Twin City Metropolitan Area owned and operated by Northwest. The club consists of a 174,551 square foot structure situated on a 631,184 square foot lot in one of the Twin Cities' more affluent and rapidly growing suburbs. The club facilities include nine tennis courts, 22 racquetball courts, aerobic dance studios, exercise areas, basketball courts, an indoor pool, locker rooms, a pro shop, a child care

area and a party room. The parties agree that the property is a single or special use property.

When the Burnsville Club was built in the late 1970s and early 1980s, racquetball was at its peak in terms of popularity. The club was built primarily as a racquetball facility, with 26 racquetball courts. The Burnsville Club is therefore substantially larger than all but one other Northwest health club in the Twin Cities area. Since that time, racquet sports have declined in popularity and sports facilities built more recently are focused on fitness such as aerobics rooms, weights, running tracks, and swimming pools. Despite the fact that the club has only nominal competition in the Burnsville area, competition from these smaller, more space efficient fitness clubs has forced Northwest to offer discounts and engage in aggressive marketing campaigns, thereby increasing its costs of attracting new members.

A customer joining Northwest becomes a member of all the clubs in its network. Northwest does not consider the number of people who join at a particular club to be an indicator of the sales that a particular facility is going to generate because many members use more than one facility. Club-specific receipts are kept on many revenue items, such as court times and pro shop sales, but club-specific revenues from other sources of income—including membership dues, the single largest source of income—cannot be precisely determined because the members belong to all the Northwest clubs. Therefore, Northwest allocates those total corporate revenues based on the number of visits that members make to each facility. Club-specific records are kept for some expenses, most notably the salaries of the workers at each club, but several of the largest expense items, such as advertising costs, promotional discounts, central purchases, and corporate salaries, are recorded only on a network-wide basis. This "corporate overhead" is allocated to the individual clubs based on visits in the same manner as membership revenues.

The Dakota County tax assessor estimated the market value of the Burnsville Club, as of January 2, 1993, at $6,298,700. Northwest petitioned the Minnesota Tax Court for review of the assessment, alleging that the value assigned to the property by the assessor exceeded the actual market value of the property and discriminated against the property in favor of comparable properties.

Evaluation testimony at trial consisted largely of two expert witness appraisers: on behalf of Northwest, Lawrence Geisler ("Geisler") of the property valuation firm of Kramer, Geisler and Strand; on behalf of Dakota County, Jason Messner ("Messner") of Peter J. Patchin and Associates. Both experts agreed that, because the Burnsville Club is so much larger than the other health clubs in the area, there were no comparable sales or rentals of other clubs in the local market that would enable the court to accurately determine the value of the club through a market comparison approach. The appraisers similarly agreed that a lack of comparable market rent data from other Twin Cities health clubs rendered the traditional income capitalization approach, in which the value of a property is determined by capitalizing the market rents of comparable properties, unreliable in appraising the Burnsville Club. Both Geisler and Messner did, however, calculate the value of the club by using the remaining traditional approach to determining real estate value—the cost approach. Both appraisers also estimated the value of the property through an "income allocation approach," a version of the income approach in which the estimated value of an income producing property is derived by discounting the subject property's revenue stream from all sources into a present worth figure through a capitalization process. Geisler's income allocation approach consisted of estimating the total net operating income of the Burnsville Club, subtracting out estimates of the income attributable to the club's furniture, fixtures and equipment ("FF & E") and, of contention here, its "business value." It then capitalized the resulting income figure to arrive at a final determination of the value of the real estate.[1] Messner

---

1. Geisler estimated the club's total net income by using club-specific income and expense data,

where available, and allocating membership income and corporate expense data for those items

similarly estimated the net operating income of the club, subtracted out the expected return on FF & E, and capitalized the result to arrive at an estimated value of the club's real estate.[2] Messner did not, however, deduct any return on business value from the net operating income prior to applying the capitalization rate but instead stated that "it is unlikely that the subject has any business value because its revenue streams are not sufficient to pay an adequate return to tangible assets."

The tax court agreed with the parties that there was insufficient sales and rental data from comparable health clubs to make a reliable market value estimate using the market comparison approach or the traditional income capitalization approach. It also rejected Northwest's income allocation approach, stating that "it is impossible to separate business income from income on the real estate" and that "there is no evidence that goodwill value calculated with reference to health club start up costs equals market value." The court similarly dismissed Messner's income allocation approach because there was insufficient supporting market data. Therefore, the tax court determined that only the cost approach would provide a reliable estimate of the value of the Burnsville Club.

Finding both Geisler's and Messner's estimation of the property's land value to be credible, the court concluded that the land was worth $1,565,000, a figure halfway between the estimates of the two appraisers. Next, the court proceeded to estimate the replacement cost of the club's building and yard improvements, independent of fixtures, furniture, equipment and business start up costs, stating that such costs are not indirect costs of the real estate. It determined that the replacement cost new of the Burnsville Club improvements was $12,000,000, again, a figure roughly halfway between the closely correlating estimates of Geisler and Messner. The court then included an additional 10% of the replacement cost new as indirect costs to reflect legal expenses, miscellaneous taxes and insurance, pre-development holding costs and a five percent entrepreneurial profit, resulting in a total replacement cost new of $13,200,000.

After calculating an estimate of the total replacement cost new, the tax court then estimated the depreciation of the Burnsville Club. While both appraisers agreed that the club had an effective age of 12 years at the time of the assessment, the court accepted Messner's estimate of the useful life of the building at 45 years over Geisler's estimate

for which club specific data did not exist. In analyzing the allocated income and expense data, Geisler used the combined financial records of only 11 of the 13 Northwest clubs then in existence. The "business value" that Geisler deducted from the net operating income was his estimate of the amortized start up expenses for the business. These start up costs included estimates of the cost of obtaining memberships, the cost of organizing the enterprise, the operating deficit necessary to break even at start-up, and the estimated business value created by belonging to the Northwest network of clubs attributable to efficiencies in marketing, management and purchasing. The deduction of this "business value" from the net operating income was based on the theory that such start up costs represent the going concern value of the club, rather than part of the value of the real estate, because if a buyer were to take over the facility they would have to either pay these start up costs again or pay a higher purchase price for a club with such items already in place.

2. Unlike Geisler, however, Messner did not use any club specific income and expense data in

calculating the net operating income of the Burnsville Club. Messner's calculation of the net operating income was instead based primarily on the total Northwest revenues and expenses allocated to the Burnsville Club based on member visits. The reason for this difference in approach was that, while Northwest provided the County with three different sets of financial statements prior to the trial date, it did not provide any club-specific revenue and expense reports until the day of the trial. Thus, prior to explaining his income allocation approach, Messner stated in his appraisal:

The appraisers have been unable to reconcile these three accounting systems. None of the accounting information reviewed has been audited, and we have been informed by the plaintiff's attorney that audited financial statements do not exist. Not withstanding the multiple formats and somewhat conflicting data provided, we will reconstruct the subject's operating statement for use in this analysis. The reader should be aware, however, that this analysis is only as reliable as the data on which it is based.

of a 40–year useful life.[3] It therefore applied a physical depreciation deduction of 27%. Similarly, the court accepted Messner's estimate of functional obsolescence due to "super-adequacies" in construction[4] and excess racquetball court space, noting that Messner's 10% figure was very close to Geisler's percentage estimate of functional obsolescence.[5] The court then turned to the major area of dispute in its cost approach analysis, the economic obsolescence of the Burnsville Club.

Geisler calculated the economic obsolescence of the club by comparing his estimate of the expected annual return on an investment in the real estate with the rate of return that he concluded the club was producing using his income allocation approach. He concluded that, because his estimate of the actual rate of return on Northwest's investment in the club was only half of his reasonably expected rate of return, the Burnsville Club suffered from 50% economic obsolescence. The tax court rejected Geisler's purportedly objective estimate of 50% economic obsolescence however because the lack of comparable market rent data made suspect his calculations. Therefore the court engaged in its own subjective analysis, considering the factors raised by both sides. The court recognized that the Burnsville Club suffered from a significant degree of economic obsolescence due to the decline in popularity of racquet sports and the fact that most new health clubs are oriented more towards less space-consuming fitness activities. While the court noted these industry trends, it also credited Messner's testimony that the Burnsville Club's location in the rapidly growing Burnsville area and its relative lack of competition countered much of the economic obsolescence caused by its outdated facilities. The court therefore chose a compromise value between Messner's estimate of 15% economic obsolescence and Northwest's 50% figure—and concluded that a 25% economic obsolescence deduction was warranted, as well as a 100% deduction of depreciated entrepreneurial profit. After including these deductions in its depreciation analysis, the court arrived at a final estimate of the Burnsville Club's value of $7,190,000.

Northwest argues that the tax court erred as a matter of law by relying exclusively on the cost approach and failing to give consideration to the income allocation analysis calculated by Geisler, a version of the income approach. This claim presents a legal issue which is reviewed *de novo. Equitable Life Assurance Soc'y v. Ramsey County,* 530 N.W.2d 544, 552 (Minn.1995). The burden of proof is on the taxpayer to show that the valuation reached by the assessor is excessive, and the tax court's valuation of a property for tax purposes will not be disturbed unless it is clearly erroneous. *Id.*

Minnesota law requires that all real property be assessed at its market value. Minn.Stat. § 273.11 (1996).

This court recognizes the three basic approaches to determining the market value of real estate: (1) the market comparison approach, which is based on prices paid in actual market transactions involving comparable properties; (2) the cost approach, which is founded on the proposition that an informed buyer would pay no more for the property than the cost of constructing new property having the same utility as the subject property; and (3) the income approach, which is predicated on the capitali-

3. Messner's figure was based upon life expectancy tables in the Marshall and Swift Valuation Service Manual which listed the typical economic life of a racquetball or fitness club at 45 years. Geisler's appraisal did not specify where he obtained his 40–year economic life estimate.

4. Messner defined "incurable functional obsolescence" as: "a defect caused by a deficiency or super-adequacy in the structure, materials, or design, which cannot be practically or economically corrected." The "super-adequacies" in construction of the Burnsville Club included the club's high quality building materials, such as its all brick exterior, and its finished ceilings and wall coverings. Messner stated that other recently constructed clubs were made of lower quality building materials and had a lower degree of finish, yet competed with the Burnsville Club in terms of function and programs. He therefore concluded that the cost of the club's high quality construction and finishes would not necessarily translate into real estate value and instead constituted incurable functional obsolescence.

5. Geisler estimated incurable functional obsolescence at 7%.

zation of the income the property is expected to generate.

*Equitable Life,* 530 N.W.2d at 552 (citing *Lewis & Harris v. County of Hennepin,* 516 N.W.2d 177, 178 (Minn.1994); *Montgomery Ward v. County of Hennepin,* 450 N.W.2d 299, 302 (Minn.1990); *Federal Reserve Bank of Minneapolis v. County of Hennepin,* 372 N.W.2d 699, 700 (Minn.1985)). The law further requires every assessor, "in estimating and determining the value of lands for the purpose of taxation, to consider and give due weight to every element and factor affecting the market value thereof." Minn.Stat. § 273.12 (1996). Accordingly, we have stated that, "[w]henever possible, appraisers should apply at least two approaches to market value because the alternative value indications derived can serve as useful checks on each other." *Equitable Life,* 530 N.W.2d at 553. However, the three valuation approaches are neither exclusive nor mandatory and the quantity and quality of available data ultimately determines which approaches are useful and how much weight each is given. *Id.* at 553–54 (citing *Alstores Realty, Inc. v. State,* 286 Minn. 343, 352, 176 N.W.2d 112, 118 (1970) (additional citations omitted)). Under appropriate circumstances, the tax court may rely on a single approach in determining the market value, provided the court clearly explains the weaknesses of the rejected approaches. *Id.* at 554 (citing *In re McCannel,* 301 N.W.2d 910 (Minn.1980); *Federal Reserve Bank of Minneapolis v. State,* 313 N.W.2d 619, 624 (Minn.1981)).

This court has stated that special purpose properties, such as the Burnsville Club, are most reliably valued using the cost approach—calculating the value of the land plus the cost of reproducing its improvements, less depreciation. *In re McCannel,* 301 N.W.2d 910, 924 (Minn.1980). Consequently, in cases where there was insufficient market or income data to make the other approaches reliable, we have upheld tax court decisions that were based on the cost approach and gave little or no weight to the income approach or market approach. *See, e.g., Lewis & Harris v. County of Hennepin,* 516 N.W.2d 177 (Minn.1994) (holding that where there was limited market and income data, tax court did not err in giving other approaches minimal weight and relying on the cost approach); *Federal Reserve Bank of Minneapolis v. State,* 313 N.W.2d 619 (Minn. 1981) (holding that, because federal reserve bank building was a special purpose building, it was not clearly erroneous to rely exclusively on the cost approach to the exclusion of the income and market approaches).

We have also recognized the usefulness of the income approach in valuing income producing properties. For example, in *Equitable Life* we upheld the tax court's reliance on a discounted cash flow (DCF) analysis, a version of the income approach, in estimating the value of a shopping center. 530 N.W.2d at 545. In so doing however, we stated that, while we found the income approach to be appropriate in that case, we did not intend to give the method universal approval. *Id.* Rather, we cautioned:

> We recognize that accurate forecasting is a crucial part of any income capitalization method, and that income and expense projections that are not warranted by market evidence can result in unsupported market values. A DCF analysis can only provide accurate results if the forecasts are based on accurate, reliable information.

*Id.* (citations omitted).

An income allocation approach would have been useful in determining the market value of a special use property such as the Burnsville Club but only if supported by accurate and reliable revenue and expense data. Here Northwest submitted four sets of financial statements to the County and only one of the statements, produced on the day of the trial, contained revenue and expense information specific to the Burnsville Club. No club-specific data was available for the single largest item of club revenue, membership dues, or for several of the club's largest expense items. Given these omissions, the tax court stated that "it was impossible to determine actual Burnsville Racquet income and expense figures" and rejected both parties' income approach valuations. The court further rejected Geisler's income allocation approach because there was no evidence establishing that the goodwill value calculated by reference to health club start up costs was

equal to the market value and relied upon the cost approach in calculating the value of the club. We conclude that the tax court did not commit clear error by rejecting the income allocation approach and relying entirely on the cost approach.[6]

 Northwest also challenges the tax court's computations of obsolescence for purposes of the cost approach, arguing that the court improperly refused to accept Geisler's "objective" determination of 50% economic obsolescence. We have held however, that a court confronted with conflicting appraisals may conclude that a compromise in valuation is required, provided it has evidentiary support and is not unreasonable or clearly erroneous. *Halla v. County of Hennepin*, 306 Minn. 533, 534, 237 N.W.2d 348, 349–50 (1975).

Since Northwest's objective calculation of 50% economic obsolescence is based upon the net return on the real estate calculated by Geisler in his application of the income allocation approach, the accuracy of Northwest's economic obsolescence figure is no better than the accuracy of the income allocation approach—rejected by the court because of lack of reliable supporting data. In the absence of such data, the court made its own subjective determination, based on factors the parties acknowledged relating to changing trends in health fitness facilities and the prime location of the Burnsville Club, and chose a compromise value between Messner's estimate of 15% economic obsolescence and Northwest's 50% figure, estimating the economic obsolescence of the Burnsville Club at 25%. The court's determination cannot be said to have been clearly erroneous. We therefore affirm the decision of the tax court.

Affirmed.

---

6. Northwest argues that the Massachusetts case *General Dynamics Corp. v. Board of Assessors*, 388 Mass. 24, 444 N.E.2d 1266 (1983), establishes that the income allocation approach employed by Geisler is the most accurate technique for valuing properties where the business and the real estate it occupies are virtually inseparable. In *General Dynamics*, the Massachusetts Supreme Court upheld the lower court's use of an income allocation approach similar to that advocated by Northwest against the county's assertion that the cost approach was the only appropriate method by which to value such a special purpose property. *Id.* 444 N.E.2d at 1271. However, far from establishing that an income allocation anal-

ysis is always the best approach for determining the value of such a property, *General Dynamics* stands only for the proposition that it is not clear error to use the approach when the cost approach would be highly unreliable:

> We should not be understood to say that the judge would have been wrong, as a matter of law, if he had determined to use the [cost approach] and had made appropriate adjustments, largely judgmental, properly to reflect obsolescence. We simply conclude that his finding that the [cost approach] was inappropriate for use in these circumstances was not clearly erroneous.

*Id.* at 1271.