# IN RE PETITIONS OF HEDBERG & SONS CO. v. COUNTY OF HENNEPIN.

232 N. W. 2d 743.

August 8, 1975—Nos. 45154, 45155, 45156.

*Gary W. Flakne,* County Attorney, and *David E. Culbert* and *Paul R. Jennings,* Assistant County Attorneys, for appellant.

*Gray, Plant, Mooty & Anderson, Kenneth M. Anderson, John W. Thiel,* and *James R. Lande,* for respondent.

*Dorsey, Marquart, Windhorst, West & Halladay, Thomas S. Erickson,* and *Robert A. Heiberg,* for city of Edina, amicus curiae, seeking reversal.

*LeFevere, Lefler, Hamilton & Pearson* and *Clayton L. LeFevere,* for Independent School District No. 280, amicus curiae, seeking reversal.

Heard before Sheran, C. J., and Otis, Kelly, Todd, Yetka, and Chanak, JJ., and considered and decided by the court en banc.

YETKA, JUSTICE.

This case comes before us on an appeal from a judgment of the Hennepin County District Court in which the petitioner's real estate was found to be excessively assessed for real estate tax purposes for taxes payable in 1971, 1972, and 1973. The court allowed petitioner 6-percent interest on any refund due from the date of payment by the petitioner. We affirm in part and reverse in part.

Petitioner owns seven adjoining parcels of real estate situated in the southeast corner of the city of Edina. Said real estate was assessed by the city in varying amounts from $15,000 per acre to over $30,000 per acre, as follows:

| Parcel No. | Acres | January 2, 1970, assessment value for taxes payable in 1971 and 1972 | | January 2, 1972, assessment value for taxes payable in 1973 | |
|---|---|---|---|---|---|
| | | Total | Per Acre | Total | Per Acre |
| 0800 | 9.25 | $ 276,000.00 | $29,837.84 | $ 294,000.00 | $31,783.78 |
| 1200 | 10.0 | $ 225,000.00 | $22,500.00 | $ 275,000.00 | $27,500.00 |
| 2800 | 37.5 | $1,128,000.00 | $30,080.00 | $1,175,000.00 | $31,333.33 |
| 4800 | 18.0 | $ 555,000.00 | $30,833.33 | $ 576,000.00 | $32,000.00 |
| 5300 | 5.0 | $ 75,000.00 | $15,000.00 | $ 100,000.00 | $20,000.00 |
| 6400 | 5.5 | $ 123,600.00 | $22,472.73 | $ 147,000.00 | $26,727.27 |
| 6800 | 5.5 | $ 123,600.00 | $22,472.73 | $ 147,000.00 | $26,727.27 |
| TOTAL | 90.75 | $2,506,200.00 | $27,616.53 | $2,714,000.00 | $29,906.34 |

Petitioner paid the taxes under protest on the basis of the assessments made and brought this action seeking to reduce said assessments and obtain a corresponding tax refund plus 6-percent interest from the date of payment of the taxes.

The court, sitting without a jury, found the challenged assessments excessive and reduced the market value of petitioner's land to an across-the-board figure of $12,000 per acre for the 3 tax years at issue. Pursuant to said reduction, the court ordered a corresponding tax refund plus 6-percent interest from the date

when the subject taxes were paid. Judgment was entered accordingly, from which respondent, County of Hennepin, now appeals.

As noted above, the seven parcels of real estate in question are located in the southeast corner of Edina. France Avenue borders that land on the west; I-494 on the south; York Avenue on the east; and West 73rd Avenue on the north.

Directly north of the subject real estate is the Yorktown Development, which is situated between West 73rd and West 70th Streets. Within this development are the following uses: Yorktown Shopping Addition, Target, Hennepin County Library, Leisure Lane Shopping Center, Freeman Store, Fashion Center (a small group of retail stores), a 500-unit apartment complex (under construction at time of trial, January 1974), an office building (under construction at time of trial), and a high-rise housing complex (under construction at time of trial). Directly north of the Yorktown Development is the Southdale Shopping complex.

The Oscar Roberts Development is located on the west side of France Avenue, bordered on the south by West 74th Street and on the north by West 72nd Street. The uses contained therein include several office buildings facing France Avenue and multi-family residential units (zoned R-4; 15 to 25 units per acre).

The land directly south of the Oscar Roberts Development is devoted to multi-family residential units, i.e., between West 74th and West 76th Streets. Continuing south (across France Avenue from petitioner's parcel No. 4800) is vacant land zoned for industrial development.

At all times relevant hereto the subject real estate was zoned R-1 (single-family residential use). Since 1948, petitioner has utilized said property[1] for sand and gravel mining and related activities pursuant to a conditional-use permit.

There is uncontroverted evidence on the record that the R-1

---

[1] The structures upon the subject land are irrelevant to this appeal because only the assessed valuation of the land is at issue.

zoning classification is employed by the city of Edina as an open or holding zone, and that such was the case with the R-1 zoning of the subject real estate. The testimony at trial indicates it is highly unlikely that the real estate at issue would be developed for single-family residences. However, the major question raised herein is not the nature of the ultimate development, but, rather, *when* that development will occur.

In 1968, the city of Edina commissioned the firm of Brauer & Associates, Inc., to perform an urban planning study for an area including the subject real estate. The results of that study, entitled the *Southeast Edina Plan Study,* were submitted to the Edina Planning Commission on October 20, 1969.

That plan proposed that petitioner's parcels numbers 0800, 1200, 2800, and 5300 be devoted to high-density multiple-family dwellings. The plan further proposed that parcels numbers 4800, 6400, and 6800 be devoted to industrial use.

However, the plan brought to light a major impediment to the development of the subject area—*traffic congestion.*[2] The plan

---

[2] The following excerpts from the Southeast Edina Plan Study are relevant:

"2. The plan area, even more so than suburbia generally, is transportation orientated, and the transportation mode on which it is completely dependent is the motor vehicle. Attractive and desirable development will depend almost completely upon the effective design and development of vehicular access to, from, and within the plan area.

"*Recommendation:* Local collector streets must be developed and maintained for the movement of traffic through adequate geometric design and access control.

"3. Vehicular access to and from I-494 is limited to one point only (France Avenue) and the existing configuration of the interchange itself is inadequate to carry existing traffic loads, and cannot, without major alterations, accommodate the increase loads from development of the plan area in the future.

"*Recommendation:* Access to and from I-494 must be *substantially* improved. Convenience and simplicity are as important as volume considerations.

"4. The proposed upgrading to state aid standards of West 76th

noted that the projected north-south traffic volumes for the year 1985 were already exceeded. The plan further indicated that access to I-494 "is the most pressing transportation need in the plan area. Major improvements in capacity and movement to and from the freeway [I-494] must be made soon, *with or without* further development within the Plan Area." (Italics supplied.)

Indeed, one of the members of the Edina City Council characterized traffic in the area as "almost a disaster."

The Southeast Edina plan was adopted by the city council in May of 1970. However, that approval was made with reservations concerning the aforesaid traffic problems.

In May of 1973, a second urban plan, including the subject real estate within its scope, was approved by the Edina Planning Commission. That plan, entitled the *South Edina Land Use Plan*, superseded the above-discussed Southeast Edina plan.

---

Street and West 70th Street in Richfield will improve the 'local' collector street system in an east-west direction to an acceptable standard within the next two years and will offer the potential for adequate service to the ultimately developed plan area as well.

"*Recommendation:* Both 70th and 76th Streets must be constructed and maintained as arterial (traffic movement) streets in Edina as well.

"5. Industrial and office land-use existing in the area develops the most critical peak load demand upon the street system. Extensive enlargements of this use in the undeveloped plan area may create a completely untenable traffic situation.

"*Recommendation:* Only the smallest segment of the site nearest the freeway should be designated for industrial and office use.

"6. Effective solution of the traffic problem in the north-south direction will require the complete and active involvement of the county and state highway departments, and must encompass the development and redevelopment of the arterial street system from West 60th Street in Edina to West 84th in Bloomington as a minimum plan area.

"*Recommendation:* The Village should formally request that Hennepin County study the arterial traffic needs of the area described above with the complete cooperation of the Minnesota Highway Department, City of Bloomington and the Village of Edina.

"A second, major, multi-lan[e], divided street must be provided to parallel France Avenue."

The South Edina plan clearly recognized relief of the traffic problem as the "highest planning authority for the area." Thus, the plan recommended that proposed real estate development should be viewed in context of the traffic generated thereby. Moreover, the plan was characterized as a general flexible guide only.

Under the South Edina plan the northern four parcels of the subject real estate, 0800, 1200, 2800, and 5300, were designated as an "exception" area whereby the proposed future use of said parcels was to be determined by the traffic generated thereby. The remaining three parcels, 4800, 6400, and 6800, were earmarked for eventual industrial use.

Significantly, the South Edina plan was adopted by the city council with the following reservation:

"[Approval was] with the understanding that it was merely a plan and that there was no assurance that the Council would rezone properties in accordance with the plan; that * * * there was no assurance that the Council would permit the maximum density specified in the plan; and that, depending on the future traffic conditions, the plan may have to be changed."

At trial, both parties utilized expert testimony as to the market value of the land at issue.[3] These expert witnesses both computed market value primarily upon the basis of the value of "comparable" parcels. It is noteworthy that both of these experts utilized appraisals formulated in 1974 in preparation for the instant litigation, adjusted so as to reflect market value for the years in question.

Petitioner's principal witness as to value was an expert real estate appraiser named Russell Smith. He testified that he considered the proposed uses in the Southeast and South Edina plans as long-range, and thus concluded that, as of 1970, the highest and best use under current zoning of petitioner's property was

---

[3] Both experts purportedly employed the definition of market value as set forth in Minn. St. 272.03.

R-1 and mining. In conformity with that view, Mr. Smith utilized sales data from ten "comparable" tracts of land which were all zoned R-1 and most of which were in the process of development into single-family residential tracts. Mr. Smith estimated the value of the subject land at $4,000 per acre in 1970, and at $4,500 per acre in 1972. On cross-examination Mr. Smith admitted that the land in question was better suited for non-R-1 use and, if so developed, would be of a higher market value.

Respondent's value expert, Kent Swanson, was the Edina city assessor who had formulated the appraisals at issue.[4] Mr. Swanson approached his appraisal with the view that the land at issue would not be developed under the R-1 zoning classification. Mr. Swanson disagreed with Mr. Smith's conclusion that the land was 20 years from development but, rather, felt that development could begin "tomorrow" or could have begun in January of 1970. Mr. Swanson, therefore, based his appraisal on the assumption that the highest and best use of the subject real property was other than R-1,[5] even though said land would have to be rezoned to allow development consistent with Swanson's appraisal. This assumption was based on a variety of factors, the most prominent of which was the historical development pattern of the area.

[4] Mr. Swanson testified that the review appraisal he presented at trial was much more thorough than the actual appraisals of 1970 and 1972, which gave rise to the instant litigation. He explained that manpower limitations in the city assessor's office prevented a thorough appraisal of each tract every two years. Evidently, the trial court disapproved of that practice.

[5] Specifically, Swanson considered the following as the highest and best uses of the subject parcels:

0800: 1970-71—1/2 service commercial; 1/2 multi-family residential.
      1972 —Office.
1200: 1970-71—1/2 service commercial; 1/2 multi-family residential.
      1972 —65 percent multi-family residential; 35 percent office.
2800: 1970-71—Multi-family residential.
      1972 —60 percent office; 40 percent multi-family residential.
5300: 1970-72—Multi-family residential.
4800, 6400, 6800: 1970-72—Industrial.

Thus, Swanson considered both the Southeast and the South Edina plans even though neither was approved as of January 1970.

The 25 comparable tracts utilized by Swanson in estimating the market value of the subject land reflected his opinion as to the highest and best use thereof,[6] and were employed to support his assumption that petitioner's property would be rezoned to reflect his projections as to future use.

Although the exact nature of the comparable properties employed by both Smith and Swanson is the subject of considerable argument in the briefs of the parties, it is our view that the widely divergent views of these two appraisers are reflected by the type of "comparables" employed. As will be more fully discussed below, neither appraiser was correct in his approach. (Evidently the trial court found such to be the case, as reflected by the $12,000 per acre market value eventually arrived at by the court.)

Mr. Swanson's estimates at trial of the value of the land in question varied from $15,000 per acre to a high of $35,600 per acre.[7] Mr. Swanson did not consider the rather considerable cost

---

[6] Four of the comparable tracts were zoned R-1.

[7] Mr. Swanson's exact appraisal figures are as follows:

0800: 1970—$32,430 per acre
      1971—$34,000 per acre
      1972—$35,600 per acre
1200: 1970—$22,500 per acre
      1971—$25,000 per acre
      1972—$27,000 per acre
2800: 1970—$30,000 per acre
      1971—$30,600 per acre
      1972—$31,330 per acre
5300: 1970—$15,000 per acre
      1971—$18,000 per acre
      1972—$20,000 per acre
4800: 1970—$30,830 per acre
      1971—$31,400 per acre
      1972—$32,000 per acre

of grading the real estate in order to render it suitable for development.[8]

The Edina city planner, Greg Luce, was called, by both parties, to testify. Mr. Luce testified that in his opinion the subject real estate would be allowed to be developed within 5 years to a non-R-1 use. In fact, Luce stated that he would approve a plan for development of that land in conformity with the South Edina plan at the time of trial. However, on cross-examination, Mr. Luce admitted that the Edina City Council had not committed itself to approve development based on that plan because of the traffic problems in the area, although he believed that traffic conditions had improved.

With regard to the council's reservations concerning the traffic in the area, petitioner called Edina Mayor James VanValkenburg to the stand. Prior to becoming mayor, Mr. VanValkenburg had served on the council since 1960. He testified that if there had been a request to rezone the subject land to a higher use in January 1970, there would have been substantial concern about traffic. The mayor further testified that since the development of Yorktown and Oscar Roberts, traffic had increased. VanValkenburg also stated that, although access to I-494 from the Southeast Edina area had been improved, there were no additional access ramps in the planning stages.

Petitioner's secretary-treasurer testified that it was the company's intention to "mine out" the property and then develop said land to a use other than R-1. Evidence on the record indicated the property would be mined out by approximately 1980.

It is also uncontroverted that Edina city policy is not to rezone

---

6400 & 6800: 1970—$22,470 per acre
          1971—$24,500 per acre
          1972—$26,720 per acre

[8] Petitioner introduced uncontroverted evidence that in 1970 it would have cost a minimum of $812,000 to level the property to a grade suitable for development.

property in absence of a request to do so. Petitioner has at no time relevant hereto requested a change in zoning.

On the basis of the above discussed record, the trial court articulated the following facts and conclusions in support of its decision:

1. The land development trend in the area indicates that the subject land will not be developed under the R-1 zoning classification.

2. The R-1 zoning classification is employed in Edina as a holding or open zone.

3. The traffic problems in the area are an impediment to further development and the Southeast and South Edina plans are long-range and contingent upon solution of the traffic problems.

4. As a corollary to the above conclusion, the court found the uses set forth in the Southeast and South Edina plans to be "remote and speculative. While within the realm of possibility in the near future, they are not reasonably probable within that time. At some point within the long-range plan, they are reasonably probable."

5. The court indicated that petitioner's expert may have "slightly" underestimated the market value of the subject land, but that the R-1 zoning status thereof restricts value.

6. On the other hand, the court found that respondent's expert improperly considered zoning changes which the court terms "remote."

7. Additionally, the court faulted respondent's expert for failing to consider the cost of grading the land in question so as to render it suitable for development. Thus, the court deemed the appraisal at issue "wholly unrealistic and arbitrary."

The issues raised are:

(1) Under the applicable scope of appellate review, does the evidence support the findings of the trial court?

(2) Did the trial court erroneously consider an improper definition of market value?

(3)   Did the trial court erroneously award prejudgment interest from the date when petitioner paid the taxes at issue?

I.

The scope of review applicable herein was recently set forth by this court in the case of In re Assessments of Silver Lake Apartments v. County of Olmsted, 295 Minn. 548, 549, 204 N. W. 2d 415, 416 (1973), as follows:

"A trial court's valuation of property for tax purposes must be sustained upon review unless it is clearly erroneous in the sense that it is not reasonably supported by the evidence as a whole. Lindahl v. State, 244 Minn. 506, 70 N. W. 2d 866 (1955); Wagner v. Commr. of Taxation, 258 Minn. 330, 104 N. W. 2d 26 (1960). The finding can be held to be clearly erroneous if the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. In re Estate of Balafas, 293 Minn. 94, 198 N. W. 2d 260 (1972)."[9]

The governing definition of market value is found in Minn. St. 272.03, subd. 8:

"Subd. 8.  'Market value' means the usual selling price at the place where the property to which the term is applied shall be at the time of assessment; being the price which could be obtained at private sale and not at forced or auction sale."

Minn. St. 273.12 sets forth a more detailed directive as to the factors which must be considered in the assessment of property for real estate tax purposes. That provision reads as follows:

"It shall be the duty of every assessor and board, in estimating and determining the value of lands for the purpose of taxation, to consider and give due weight to every element and factor affecting the market value thereof, including its location with

---

[9] See, also, Alstores Realty, Inc. v. State, 286 Minn. 343, 176 N. W. 2d 112 (1970); Great Plains Supply Co. v. County of Goodhue, 268 Minn. 407, 129 N. W. 2d 335 (1964); Red Owl Stores, Inc. v. Commr. of Taxation, 264 Minn. 1, 117 N. W. 2d 401 (1962).

reference to roads and streets and the location of roads and streets thereon or over the same, and to take into consideration a reduction in the acreage of each tract or lot sufficient to cover the amount of land actually used for any improved public highway and the reduction in area of land caused thereby, provided, that in determining the market value of vacant land, the fact that such land is platted shall not be taken into account. An individual lot of such platted property shall not be assessed in excess of the assessment of the land as if it were unplatted until the lot is improved with a permanent improvement all or a portion of which is located upon the lot, or for a period of three years after final approval of said plat whichever is shorter. When a lot is sold or construction begun, the assessed value of that lot or any single contiguous lot fronting on the same street shall be eligible for reassessment. It shall be the duty of every assessor and board, in estimating and determining the value of lands for the purpose of taxation, to consider and give due weight to lands which are comparable in character, quality, and location, to the end that all lands similarly located and improved will be assessed upon a uniform basis and without discrimination and, for agricultural lands, to consider and give recognition to its earning potential as measured by its free market rental rate."

It is apparent that the trial court correctly considered the aforesaid statutory directives in reaching its ultimate decision since there is reference in the record to those statutes.

As stated above, petitioner's expert appraiser predicated his valuation of the subject realty upon the theory that its use for the years in question was limited to single-family residences and mining. Conversely, respondent's expert based his appraisal upon the theory that the uses of the subject land would be service-commercial, multi-family residential, office, and industrial, even though such development would require a change in the zoning classification. Under applicable law, neither appraiser employed the correct approach. It appears to us that the trial court recog-

nized that fact and valued the subject real estate accordingly.

This court's opinion in State, by Lord, v. Pahl, 254 Minn. 349, 356, 95 N. W. 2d 85, 90 (1959), contains the following language which is relevant here:

"Existing valid zoning ordinances may prescribe or limit those uses which may be considered in proving market value. Evidence of value for uses prohibited by an ordinance may be introduced and considered only where there is evidence showing a *reasonable probability* that the ordinance will be changed in the near future. * * * The general rule is stated in 4 Nichols, Eminent Domain (3 ed.) § 12.322, as follows:

" 'Insofar as existing zoning restrictions circumscribe the available uses to which land may be devoted they unquestionably affect the market value of property and no evidence in support of an enhanced value may be admitted where such enhanced value would be the result of a proscribed use.' " (Italics supplied.)

In Alstores Realty, Inc. v. State, 286 Minn. 343, 176 N. W. 2d 112 (1970), this court, in a case challenging the assessed value of realty, noted that the zoning classification is an important factor.

There is little question that in an appropriate case the probability of future zoning modification is a factor to be considered by the trier of fact in considering the question of the market value of the real property at issue. Perhaps the court in Masheter v. Ohio Holding Co. 38 Ohio App. 2d 49, 55, 67 Ohio O. 2d 262, 266, 313 N. E. 2d 413, 418 (1973), best explained the underlying rationale when it stated:

"* * * If, however, such a purchaser would be presently willing to pay more than an amount justified by the uses permitted under existing zoning because of a general belief that there is a *probability* of a change in zoning, to permit a more valuable use within the reasonably foreseeable future, such evidence is admissible because it does reflect a factor in the present fair market value under existing zoning."

In any event, it is manifest that the probative weight of such evidence is to be determined by the trier of fact.[10] Moreover, as with all fact questions, the value of precedent is minimal at best.[11]

Turning to the evidence of record in the case at bar, it is quite clear that the subject land will be developed to some non-R-1 use at *some* future date. However, there is a good deal of conflict as to when that date will be. The trial court properly considered that the traffic problems in the area could impede rapid development of the land in question. So, also, could the trial court find that the costs of preparing the land for immediate development would be a negative factor, to some degree at least. In summation, there is ample evidence to support the trial court's holding that development of the land in question under existing municipal plans was "remote and speculative." Therefore, in conformity with the standard set forth in State, by Lord, v. Pahl, *supra,* the court was well justified in not adopting the appraisal of respondent's expert. In fact, the trial court would have been justified in entirely rejecting the testimony.[12]

Similarly, petitioner's expert appraisal was subject to doubt in view of his refusal to give any consideration to the ultimate nature of the use to which the subject land would be devoted.

Thus, the trial court was faced with the two conflicting appraisals, but, as evidenced by its compromise in valuation, does appear to have allowed the future use of the subject realty to be reflected in its ultimate decision.

---

[10] State v. Gorga, 26 N. J. 113, 138 A. 2d 833 (1958); In re Mackie's Petition, 362 Mich. 697, 108 N. W. 2d 755 (1961); People v. Donovan, 57 Cal. 2d 346, 19 Cal. Rptr. 473, 369 P. 2d 1 (1962).

[11] In re Mackie's Petition, *supra.*

[12] In Hutchinson v. Baltimore Gas & Electric Co. 241 Md. 329, 332, 216 A. 2d 573, 575 (1966), the court stated: "* * * [I]t is manifestly improper to allow a real estate appraiser * * * to value property as if it were in fact already zoned to the higher classification."

## II.

Respondent and the amici curiae allege that the trial court did not utilize the proper definition of market value in reaching its decision.[13] This assertion is unsustainable for two reasons.

First, a review of the record indicates that the trial court was fully and repeatedly apprised of the controlling definition of market value applicable in real estate tax assessment cases, which is set forth in Minn. St. 272.03, subd. 8, quoted above.

Secondly, a review of the trial court's memorandum discloses that the trial court, in fact, made its determination pursuant to the aforesaid statutory guideline.

## III.

In General Mills, Inc. v. State, 303 Minn. 66, 226 N. W. 2d 296 (1975), this court established that a taxpayer is entitled to 6-percent interest on a refund of personal property taxes illegally collected from the date a petition for refund is filed until the date of the actual refund. That holding was predicated upon the theory that—

"* * * interest is not a penalty, but rather is the payment of a reasonable sum for the loss of use of money. McCormack v. Hankscraft Co. 281 Minn. 571, 161 N. W. 2d 523 (1968) ; Potter v. Hartzell Propeller, Inc. 291 Minn. 513, 189 N. W. 2d 499 (1971). * * *

"We also recognize that the granting of interest would comport with modern financial practice. Governmental units are extremely aware of the necessity of promptly investing public funds. The payment of a tax obligation therefore generates interest which may properly serve as a source of funds for the pay-

---

[13] Some reference is made to the fact that petitioner's expert may have erroneously applied a different standard of market value used in condemnation cases, as opposed to that used in real property tax assessment cases. However, that witness explained that so-called difference in some detail so as to allow the trier of fact to view his conclusions according to proper standards.

ment of interest on its refund." 303 Minn. 70, 226 N. W. 2d 299.

It is quite apparent that the above-quoted rationale is equally applicable to the refund of taxes paid according to an excessive real property tax assessment.

However, the question of when this interest begins to run remains to be considered. Returning to the General Mills case, this court addressed that issue as follows:

"Having decided that interest should be paid, we must also determine the period during which it will accrue. As between ordinary persons, interest on money runs from the time the money becomes due and payable until the payment is made. Where money has been paid and received under a mistake of fact, and no fraud or misconduct can be imputed to the party receiving it, money does not become due and payable, and is not considered in default, until a demand for payment has been made. Johnson v. Johnson, 250 Minn. 282, 84 N. W. 2d 249 (1957); I. L. Corse & Co. v. Minnesota Grain Co. 94 Minn. 331, 102 N. W. 728 (1905).

"Accordingly, we hold that interest should not begin to accrue on a tax refund until the protesting taxpayer has made a demand on the taxing unit of government. Within the statutory scheme provided for refunds, then, interest should not start to accumulate until the protesting taxpayer has filed a petition for a personal property tax refund. A petitioning taxpayer may minimize his loss of interest by filing his petition promptly, and the county will therefore not be charged with any delays thus created by the taxpayer." 303 Minn. 71, 226 N. W. 2d 299.

That rationale is adopted in this case.

As we pointed out in the General Mills case, personal property taxes must be paid in full, with exceptions only in hardship cases, as a condition precedent to contesting the imposition or amount of the tax. In the case of real estate taxes, however, under Minn. St. 278.03, only 50 percent of the disputed tax, with a similar

hardship exception, is required to be paid prior to petitioning under § 278.01 for determination of the validity of the tax. If the petition is not determined by November 1, at least 50 percent of the remaining tax must be paid.

Therefore, we hold that interest on refunds of real estate taxes should accrue from the date of the filing of the petition for review under § 278.01 or from the date of payment, whichever is later. The interest, of course, is assessable only on the refund itself.

Our holding is not to be construed to apply to other litigation where the sum sought may be unliquidated. It is restricted to petitions and actions for tax reductions or refunds. It appears to us reasonable that if the government is to seek penalties and interest for past-due taxes, that it ought to pay interest on money which it, in fact, has retained under an improper assessment.

The trial court ordered interest to be awarded from the date of *payment* of the subject taxes. Since the trial court was at least theoretically in error, we reverse that part of the judgment and remand this matter to the trial court for computation of interest in accordance with this opinion.

The decision of the trial court is, in all other respects, affirmed.

Affirmed in part; reversed in part, and remanded.

MR. JUSTICE SCOTT took no part in the consideration or decision of this case.