OPINION
Stouder Memorial Hospital (Stouder) was constructed in 1928 in Troy, Ohio, and was operated as a full-service hospital until 1998. At that time, Stouder and another local hospital (Piqua Memorial) were closed. The medical procedures that Stouder and Piqua had handled were then consolidated in a new facility owned by Upper Valley Medical Center (UVMC). UVMC also owned Stouder and Piqua.
UVMC had contemplated closing Stouder and Piqua for some time before it actually happened. Consequently, in 1996, UVMC began negotiating with Richard Coleman over the sale of the hospitals. Coleman was an established developer who specialized in buying and developing historic properties. After UVMC expressed reluctance to sell, Coleman submitted an "option to enter into a lease agreement" in June, 1996. In the agreement, Coleman proposed the development of elder care and assisted living facilities on the hospital sites. However, UVMC rejected Coleman's proposal in November, 1996. At that time, UVMC said it wanted to independently examine development possibilities, including the conversion of Stouder into an independent living center.
Ultimately, after conducting architectural and market studies, UVMC decided that converting the hospitals to assisted living space was not feasible. Because Coleman was still interested in developing the properties, UVMC and Coleman again began to negotiate. In late February, 1999, Coleman offered to purchase both Stouder and Piqua. UVMC then publicly announced the offer to the local community and solicited other offers. In particular, UVMC notified and met with public officials in the City of Troy to discuss Stouder's conversion to governmental space. UVMC also gave tours of Stouder to other groups, including the University of Phoenix, which had expressed interest in opening a branch location. Various articles about the solicitation of offers and progress on the proposed sale appeared in both the Troy newspaper and the Dayton Daily News.
Additionally, UVMC engaged American Appraisal Associates (AAA) to evaluate the fair market value of both hospitals. On March 3, 1999, AAA issued a report estimating Stouder's value as zero, and Piqua's value as minus $1,000,000. The basis for the low value was the high cost of renovation or demolition and limited alternative uses for closed hospitals.
UVMC did not receive any other offers for the two properties. After touring Stouder, the City of Troy decided the space was too large and would cost too much to renovate. Likewise, the University of Phoenix did not find the space suitable. As a result, UVMC and Troy-Piqua Housing, Inc. (TPH), signed an agreement on June 3, 1999, for the sale of both hospitals. At the time, Coleman was the president and principal stockholder of TPH.
Under the agreement, TPH was to purchase the Stouder and Piqua real estate, as well as certain items of personal property in the buildings, for $200,000. Of this amount, $50,000 was allocated to personal property ($25,000 for each hospital), and $150,000 was allocated to the real property ($75,000 for each hospital). A further condition of the agreement was that the deeds would incorporate a restrictive covenant preventing TPH and its successors from using the facilities for medical services or any other purpose competitive with UVMC's business operations. The restrictive covenant did, however, allow the premises to be used for public or private independent living facilities. In an addendum to the agreement, TPH also granted UVMC a lease and easement rights for some parking spaces.
The closing took place on July 29, 1999. Subsequently, on August 13, 1999, TPH filed a complaint against valuation of property for the tax year 1999 with the Miami County Board of Revision (BOR). Before that tax year, both Stouder and Piqua had been tax exempt. However, after the hospitals were closed, they were placed on the auditor's tax list at the auditor's tax value. Thus, at the time the complaint for valuation was filed, Stouder's current taxable value from the tax bill was $18,005,700. In the complaint, TPH asked the BOR to reduce the fair market value of the Stouder real estate to $75,000.
After the valuation complaint was filed, Park Place Properties, Ltd. (PPP) purchased the Stouder real estate for $67,500, and the remaining Stouder personal property for $7,500. PPP then filed its own complaint against valuation.
The sole shareholder in PPP was Robert Cole. Cole was a local developer who bought and renovated older properties in the Troy area. Cole had originally approached UVMC about buying Stouder before the property was sold to Coleman. Although Cole decided not to tender an offer at the time, he later became interested and approached Coleman about selling. Cole and Coleman met and agreed upon a price, without using a realtor or broker. They then used lawyers to work out the details. Ultimately, they signed a purchase agreement on December 29, 1999.
On the same day the purchase agreement was signed, Cole and Coleman also signed a consulting agreement. Under this agreement, Coleman was to advise and consult with Cole for two years about developing, managing, and operating a multi-use facility on the Stouder property. In exchange, Cole agreed to pay Coleman $85,000. According to Cole, his own agreement to the Stouder sales price was contingent on the consulting agreement. Specifically, Cole was aware of Coleman's expertise and felt the project was only viable with Coleman's help. On the other hand, Coleman testified that his own assent to the sales price did not depend on execution of a consulting agreement. Instead, the offer came from Cole's side. In this regard, Coleman said that he would have sold the property for the selling price if he were comfortable that Cole had competent advice in developing the property.
As we said, after PPP purchased Stouder, it filed a complaint against valuation with the BOR. A complaint against valuation had also been filed concerning the Piqua property. Accordingly, on May 22, 2000, the BOR held a consolidated hearing on both complaints, as well as counter-complaints of the Troy and Piqua Boards of Education (BOE). At the hearing, the BOR received testimony from Coleman and Cole. TPH and PPP also submitted various documents, including the AAA appraisal, to support their claim that the taxable value of the Stouder and Piqua properties should be reduced.
According to the record, the Stouder property consists of about 11.7 acres of land, a main hospital building of about 176,951 square feet, and several storage facilities of moderate size. As we said earlier, the building was constructed in 1928. Since that time, several additions have been built. At the time of the hearing, the property was zoned R-5, Residential, which allowed a variety of residential, civic, and institutional uses, including single family and multi-family dwellings, parks, golf courses, country clubs, schools, medical offices, and group homes. The zoning did not allow for warehouse facilities.
At the hearing, the BOR indicated several times that further testimony might be required. However, on October 11, 2000, the BOR instead notified PPP that it would reconvene on October 25, 2000 to render a decision in the case. In this letter, the BOR stated that:
 [t]his is simply an administrative meeting to be used for discussion and decision by the Board members only. No comments or questions from the floor will be heard by the Board. Your attendance is NOT required. Certified notices of all decisions will be mailed to the complainants and their agents following this meeting.
At the October 25, 2000 meeting, the BOR indicated that the sales of the property were not "arms-length" sales and did not reflect true value. Among the factors relied on by the BOR were UVMC's failure to list the property with brokers or to advertise in journals; the lack of negotiations; and possible compulsion. In this regard, the BOR focused on indications that UVMC was incurring security, utility, and maintenance costs. Likewise, Coleman incurred the same kinds of costs after he purchased the property, and this may have been a factor in the sale to PPP.
The BOR also rejected the AAA appraisal, because it was conducted for disposal purposes, not for tax valuation. Additionally, the BOR found some discrepancies in the report (mainly about the acreage and effective date of valuation). In this context, the BOR noted that the appraisers had not been available for questioning.
In the decisional hearing, the BOR also noted that it had asked Mike Groff, of Manitron Sabre Appraisal (Sabre) to appraise the property. The BOR then asked Groff to comment on his process and conclusions. According to Groff, there are three standard ways to value property: the market approach, the income approach, and the cost approach. Groff indicated that he did not use the market approach, due to the lack of comparable properties with the same type of deed restrictions. Using the income approach, and a fifty cent per square foot rent figure, Groff arrived at a value of $499,800 for Stouder. Similarly, the cost approach (which focuses generally on building costs minus depreciation) yielded a value of $521,600.
The BOR did not ask for comments from the parties during the October decisional hearing. After Groff discussed his report, the BOR voted to accept $521,600 as the appropriate tax valuation for the property. PPP and TPH then appealed to the Miami County Common Pleas Court.
On appeal, the trial court decided to call Groff for cross-examination, since that had been denied at the administrative level. Both PPP and TPH objected to Groff's additional testimony and to the inclusion of his report in the record. Their objections were based on the fact that Groff had not been called to testify before the BOR and that his appraisals had not been identified or entered into the record at the administrative hearing. However, the court overruled the objections. The court also refused to let PPP present additional testimony from David Meckstroth, the UVMC president, and from the AAA appraiser and director.
After the hearing, the trial court issued a decision finding that the $75,000 sale price for Stouder did not reflect true value. The court then reviewed the evidence and concluded that Stouder's value as of January 1, 1999, was $521,600. Accordingly, the court affirmed the decision of the BOR. PPP then appealed, raising the following assignments of error:
 I. The true market value of parcel No. D08-041705 (Stouder) is the sale price on December 29, 1999, of $67,500 and the sale price on July 29, 1999, of $75,000.
 II. The appraisal of Sabre Systems of Stouder is not supported by the evidence.
 III The appraisal of AAA supports the sale prices of Stouder on December 29, 1999, of $67,500 and on July 29, 1999, of $75,000.
 IV. The common pleas court improperly denied Appellant the right to present certain evidence in its appeal.
 I
As we mentioned, PPP claims in the first assignment of error that Stouder's true value was the $67,500 sales price of December 29, 1999, or the $75,000 sales price of July 29, 1999. In this regard, PPP contends that the testimony at the BOR hearing established a rebuttable presumption concerning the true value of the property. According to PPP, neither the auditor nor the Troy BOE presented competent evidence to rebut this presumption. As a result, PPP believes that the Sabre appraisal report never became an issue and should not have been considered by either the BOR or the trial court.
By statute, the county auditor is to decide the "true value" of each parcel of real estate from the best information sources available, in accordance with the rules prescribed by R.C. Chap. 5713 and R.C. 5715.01, and in accordance with "uniform rules and methods of valuing and assessing real property as adopted, prescribed, and promulgated by the tax commissioner." R.C. 5713.03. With regard to true value, R.C. 5713.03
further provides that:
 if such tract, lot, or parcel has been the subject of an arm's length sale between a willing seller and a willing buyer within a reasonable length of time, either before or after the tax lien date, the auditor shall consider the sale price of such tract, lot, or parcel to be the true value for taxation purposes.
"An arm's-length sale is characterized by these elements: it is voluntary, i.e., without compulsion or duress; it generally takes place in an open market; and the parties act in their own self-interest." Walters v. Knox County Bd. of Revision (1989), 47 Ohio St.3d 23.
The rebuttable presumption mentioned by PPP arises from a series of Ohio Supreme Court cases, in which the court has "recognized a rebuttable presumption that the sales price reflects the true value of property." Cincinnati School Bd. of Edn. v. Hamilton Cty. Bd. of Revision (1997),78 Ohio St.3d 325, 327. However, if evidence is introduced that the sale did not reflect true value, and more specifically, that the sale was not an arms-length transaction, the rebuttable presumption either disappears or never arises. Id.
In appeals from a board of revision, the common pleas court hears the appeal on the basis of the evidence before the board or such additional evidence as is submitted to the court. R.C. 5715.05. The common pleas court then independently values the property, and its decision is not to be reversed absent an abuse of discretion. Siebenthaler Co. v. Montgomery Cty. Bd. of Revision (1991), 74 Ohio App.3d 103, 105, citing Black v. Bd. of Revision (1985), 16 Ohio St.3d 11. As the Ohio Supreme Court observed in AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp. (1990), 50 Ohio St.3d 157, 161:
 most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.
 A decision is unreasonable if there is no sound reasoning process that would support that decision.
In rejecting the Stouder sales prices as the true value, the trial court found, as a factual matter, that the sales transactions were not conducted at arms length. In particular, the court relied on these facts: 1) the parcels were never marketed on a statewide or national level; 2) negotiations for both sales took place without appraisers, brokers or real estate agents involved; 3) the seller in the first sale was granted parking concessions and reimbursement for one-third of all personal property liquidated within one year; 4) UVMC was spending a lot of money on security, utilities and insurance, and was glad to find someone with an interest in title; and 5) the second sale included a consulting contract for the seller. The BOR made essentially the same findings when it concluded that the sales were not arms-length transactions.
Although different conclusions might be reached, the finding that the transactions were not at arms-length is reasonable. Consequently, since the sales were not made at arms-length, PPP was not entitled to a rebuttable presumption that the sales prices reflected true value.
In this context, the BOE argues that an additional reason exists why the sales prices in this case cannot reflect the true value of the property. According to the BOE, fee simple estates must be valued for tax purposes as if they are unencumbered. Since the deed restriction in this case prevented the property from being used for medical purposes, the value of the property would have been affected.
In several cases, the Ohio Supreme Court has indicated that fee simple estates are to be valued as if they are unencumbered. See, e.g., Alliance Towers, Ltd. v. Stark County Bd. of Revision (1988),37 Ohio St.3d 16, paragraph one of the syllabus (involving federally subsidized housing and no sale). However, the court has also said that for purposes of achieving uniformity, "[i]f the sale price includes a value that can be determined for the government subsidies, then that portion of the sale price should be deducted in arriving at the true value of the real property." New Winchester Gardens, Ltd. v. Franklin County Bd. of Revision (1997), 80 Ohio St.3d 36, 45 (involving federally subsidized housing and actual sale).
The Ohio Supreme Court has not always been completely consistent in this area. For example, in Beckett Ridge Assn. No. I v. Butler County Bd. of Revision (1982), 1 Ohio St.3d 40, the court held that county auditors were required to apply various factors outlined in the Ohio Administrative Code for valuing land, including "topography, neighborhood type and trend, zoning, restrictions, and easements." Id. at 41, citing R.C. 5713.03 and Ohio Adm. Code 5705-3-07(B). Beckett Ridge involved 15 undeveloped parcels of common space that were owned by a condominium association, the use of which was restricted by zoning ordinances and association agreements. In reversing the decision of the Board of Tax Appeals (BTA), the court held that the BTA must consider all the factors in the statute and administrative code, including the reduction in value of the parcels resulting from the zoning ordinance and the association agreement. Id. at 43. Alliance Towers was decided later, and did not mention Beckett Ridge.
Subsequently, the court discussed both cases in Muirfield Assn., Inc. v. Franklin Cty. Bd. of Revision (1995), 73 Ohio St.3d 710. Like Beckett Ridge, Muirfield involved a common area in a planned development, but the common area was also developed with various amenities, like a swimming pool and clubhouse. Id. at 711. After the auditor and BOR assessed a value of $336,000, the association appealed to the BTA, claiming that the land had zero value due to easements held by all the owners in the development. The BTA generally agreed, and found a value of only $2,500.
On further appeal, the Ohio Supreme Court reversed and remanded the case to the BTA. Id. at 712. In doing so, the court commented that:
 [i]n resolving * * * [Beckett Ridge], we called on the tax authorities to establish and apply uniform standards to take into consideration all relevant factors in valuing such property. Nevertheless, we did not prescribe the type of estate to be valued for tax purposes in Beckett Ridge; we prescribed this in Alliance Towers.
Id. As a result, the court directed the BTA to value the property as a fee simple estate, unencumbered by restrictions voluntarily undertaken in the warranty deed. Id. Based on Muirfield, then, real property is to be generally valued as a fee simple estate, without consideration of encumbrances or restrictions, with certain exceptions, such as the government subsidies involved in New Winchester Gardens. Although the court's position conflicts with Ohio Adm. Code 5705-3-07(B) (which includes restrictions as a valuation factor), the Ohio Supreme Court has not chosen to address the point.
In view of the above analysis, the BOE is correct in claiming that the Stouder property should have been valued without consideration of the restrictive covenant. However, for purposes of this case, that made no difference, since no one, in fact, assigned a specific value to the covenant. The Sabre appraiser erroneously rejected the market approach, stating that he could find no other comparable properties with such a restriction that had sold. However, his task would have been to find comparable properties without a deed restriction. Ironically, the AAA appraisal, which was rejected by the BOR, did include comparisons of comparable properties without deed restrictions. The only comparable properties AAA ruled out were hospitals that had been reopened, based on AAA's belief that any sale would include a covenant preventing Stouder from being reopened as a hospital.
Nonetheless, no one, including PPP's witnesses, assigned any specific value to the restrictive covenant. The covenant obviously lowered Stouder's value. On the other hand, even if the covenant's value were added to the sales price, the "true value" may still been below the amount of the Sabre appraisal. Since PPP had the burden of proof on this point, we can only conclude that PPP failed to meet its burden. Knowlton Realty Co. v. Darke Cty. Bd. of Revision (1997),77 Ohio St.3d 438, 441-42 (finding that purchaser did not meet its burden of proof when it failed to present evidence on how the sales price would have changed if property were not encumbered by a mortgage and by an indemnification agreement).
Based on the preceding discussion, the trial court did not err in finding that the sales prices for Stouder were not the "true value" of the property. Accordingly, the first assignment of error is overruled.
 II
In the second assignment of error, PPP contends that the Sabre appraisal was not properly before the BOR and the common pleas court. Alternatively, PPP says that the appraisal was not supported by the evidence.
Much of PPP's argument in this assignment of error is based on issues we have already considered. Specifically, PPP claims that the only evidence presented during the actual BOR hearing indicated that the Stouder sales prices reflected true value. However, this is not correct. Even if the BOE failed to present any evidence at the hearing, the BOR and the trial court were still entitled to examine the facts themselves to see if an arms-length transaction existed.
PPP is also incorrect in contending that Groff had to be sworn and directly examined at the BOR hearing in order for the appraisal report to be considered. Under R.C. 5715.11, the BOR is directed to investigate all complaints relating to the valuation and assessment of real property. While the statute does not say precisely how the BOR should investigate, it also does not limit the BOR's power. In this regard, the BOE cites Board of Ed. of Cleveland City School Dist. v. Cuyahoga County Bd. of Revision (1973), 34 Ohio St.2d 231, paragraph one of the syllabus for the proposition that the BOR must obtain all information relevant to valuation, "either from the parties or through its own independent investigation." However, this paragraph of the syllabus was later overruled in Renner v. Tuscarawas Cty. Bd. of Revision (1991),59 Ohio St.3d 142. The result in Renner was based on the court's belief that taxpayers have the duty to prove a right to a reduction in value, and that the BOR does not have a duty to independently investigate. Id. at 145.
By the same token, the lack of an independent duty does not mean the BOR is precluded from investigating. Further, an appraisal is certainly a reasonable source of help. Accordingly, the BOR did not act improperly by asking for an appraisal of the property. The real issue, instead, is whether the BOR should have reconvened the hearing so that Groff could be cross-examined.
In reviewing procedural choices of the BOR or BTA, an abuse of discretion standard is generally applied. See, e.g., Coats v. Limbach (1989), 47 Ohio St.3d 114, and Strongsville Bd. of Educ. v. Cuyahoga County Bd. of Revision (1990), 53 Ohio St.3d 254, 256. For example, in Coats, the Ohio Supreme Court held that the BTA abused its discretion by failing to reconvene a hearing and accept further testimony, where the complainant had properly requested a continuance. 47 Ohio St.3d at 117. The court did not consider an additional due process argument, since the case was decided on abuse of discretion grounds. Id.
After examining the record, we find no abuse of discretion. As we mentioned earlier, the Sabre appraisal was presented at a decisional hearing, not an evidentiary hearing. Before the hearing, the BOR notified the parties that the hearing would be administrative only, and that questions and that comments would not be allowed. No one filed an objection to this format, nor were any objections lodged at the hearing. While one might assume that objections would be futile, given the BOR's remarks, a party who is aggrieved by a tribunal's procedure should make some attempt to object. However, that was not done here. Instead, all that appears in the record is a letter from PPP's counsel, indicating that he would not attend the decisional hearing, due to a prior commitment. Significantly, no continuance was requested, nor were any objections lodged.
To the extent that due process is an appropriate issue, we find no violation in the receipt of comments from the Sabre appraiser at the decisional hearing or in the submission of his report. "Due process mandates that prior to an administrative action which results in a deprivation of an individual's liberty or property, the governmental agency must afford that individual reasonable notice and an opportunity to be heard." 75 Public Square v. Cuyahoga Cty. Bd. of Revision (1991),76 Ohio App.3d 340, 345.
In Alliance Towers, supra, a taxpayer claimed denial of due process because the county auditor was a member of the BOR. The basis of another alleged due process violation was that the BOR had hired an appraisal witness and had given him specific instructions for his report.37 Ohio St.3d at 25. However, the Ohio Supreme Court rejected these claims. Among other things, the court focused on the lack of evidence that the BOR had failed to act "in good faith and in the exercise of sound judgment." Id. The court also noted that the legislature had provided for appeal and de novo review to counteract any conflict of interest. Id. Finally, the court found nothing improper about the fact that the BOR had asked an appraiser to prepare a report. Id.
PPP did not present any evidence indicating that the BOR failed to act in good faith and in the exercise of sound judgment. Under the circumstances, we find nothing objectionable in the fact that the BOR asked for an appraisal, and then accepted it as part of the record. We also find nothing wrong with the decision not to allow cross-examination of the Sabre appraiser. Compare W.S. Tyler Co. v. Board of Revision of Lake Cty. (1991), 57 Ohio St.3d 47, 49 (finding no due process violation, even though BOR may have acted discourteously and hastily in issuing a decision one day after the taxpayer's brief was due). While allowing cross-examination at the BOR might have been more courteous, the failure to do so was not a violation of due process.
Furthermore, submission of the Sabre appraisal did not prejudice PPP, nor did it bind the common pleas court. Specifically, the common pleas court hears the same evidence as the BOR, or such additional evidence as is deemed necessary. The court then independently values the property. Siebenthaler Co., 74 Ohio App.3d at 105. Due to its ability to independently value the property, the trial court was free to accept or reject any evidence, was not bound to accept the BOR decision, and could exercise its own judgment. Accordingly, the trial court did not violate due process by considering the appraisal on appeal.
In our opinion, the trial court acted properly and courteously when it gave PPP the chance to cross-examine the appraiser. Although PPP feels the trial court was trying to improperly bolster the administrative record, we think the court was simply trying to create an adequate record.
As we said earlier, PPP also argues that the Sabre appraisal was not supported by the evidence. In this regard, PPP first claims that Groff's credentials were inadequate. A requirement for an expert witness is that "`[t]he witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony.'" Freshwater v. Belmont County Bd. of Revision (1997),80 Ohio St.3d 26, 31, quoting from Evid. R. 702(B). After reviewing the record, we find that Groff was adequately qualified. First of all, although Groff admitted that he did not currently hold a general appraisal certificate, he also said that the certificate is not required for his employment. Further, the rest of Groff's testimony reveals that he has had substantial experience in performing appraisals, including 20 years working in the field. Consequently, even if Groff was not the most highly qualified appraiser, he had sufficient experience and specialized knowledge to qualify as an expert.
PPP also complains because Groff found the highest and best use of the property to be commercial or retail warehousing, even though the zoning did not permit such uses. The BOE does not really respond to this point, other than to say that PPP would not benefit if the Sabre appraisal were thrown out, as the court would simply then have to use the auditor's original valuation of about $18,000,000.
As we mentioned earlier, the hospital property was zoned R-5 at the time of valuation. Permitted uses under this zoning designation (R-5, Multiple Family District) included a variety of residential, civic, and institutional uses, like single and multiple-family dwellings, parks, golf courses, country clubs, schools, medical offices, and group homes. Warehouse and office facilities were not permitted. Groff testified that he did not think a zoning change would be a problem. While Groff acknowledged that he did not consult anyone about a potential zoning change, he also said the city was very willing to work with the new owners and wanted the properties to be used for something. However, Groff additionally admitted that he was aware of neighborhood opposition to a zoning change.
In Porter v. Cuyahoga County Bd. of Revision (1977), 50 Ohio St.2d 307, the Ohio Supreme Court held that:
 [i]n determining the value of property for tax assessment purposes, the taxing authority may not consider an appraisal of property in which the appraiser, believing the property to be more valuable than its permitted uses under current zoning laws indicate, values the property as if it were already zoned for its most profitable use.
Id. at syllabus. The court further noted in the opinion that
 [s]ince the proper method of valuation in Ohio is based on the fair market value that the assessed real property would bring if sold on the open market, evidence of potential uses of the land under future zoning laws cannot be completely proscribed from the valuation process in all cases. Because the proper test of fair market value is what a willing buyer will pay to a willing seller, the record may show in a proper case that a willing buyer will pay more for property than its current zoning classification would justify. * * * However, before the taxing authority may increase a taxpayer's assessment to reflect this willingness of buyers to speculate, the record must support such conclusion. A belief on the part of the real estate appraiser that property is more valuable than its permitted uses indicate, without market data to support such belief, is insufficient.
Id. at 312. In applying these standards, the Ohio Supreme Court rejected the BOR's appraisal because no evidence was presented to show that "in the past buyers were paying higher prices for property zoned residential in the hope of a future zoning change, or that the city * * * was rezoning property purchased for future development as a matter of course." Id. at 313.
Unfortunately, the appraisal in the present case did not contain market data supporting the claim that a willing buyer would pay more than the current zoning classification would justify. Likewise, Groff's testimony did not provide a basis for concluding that the City of Troy rezoned property purchased for future development as a matter of course, or that buyers had previously paid higher prices for property in hopes of future zoning changes. These facts may well be true, but they are not in the record.
The Ohio Supreme Court noted in Porter that the case was one of first impression in Ohio. In deciding that evidence supporting an appraiser's beliefs about zoning was needed, the court relied on a case from the Minnesota Supreme Court, i.e., Hedberg Sons Co. v. Cty. of Hennepin (Minn.Sup.Ct. 1975), 232 N.W.2d 743. See 50 Ohio St.3d at 312, n. 7. In Hedberg, the county's appraiser had based his valuation on a proposed zoning change. 232 N.W.2d at 747-48. At trial, the mayor and city planner testified about zoning issues and city development policies. Id. at 748-49. However, because their testimony indicated that the proposed zoning change was remote and speculative under existing municipal plans, the trial court and the Minnesota Supreme Court both rejected the county's appraisal of the land value. Id. at 751. Specifically, the Minnesota Supreme Court commented that:
 "`[e]vidence of value for uses prohibited by an ordinance may be introduced and considered only where there is evidence showing a reasonable probability that the ordinance will be changed in the near future.' "
Id. at 750 (citation omitted).
Subsequently, in Alliance Towers, the Ohio Supreme Court reiterated that it "had already recognized the limitation on value generated by zoning restrictions." 73 Ohio St.3d 710, 712, citing Porter,50 Ohio St.2d 307. As we already mentioned, the court also said in Alliance Towers that self-imposed restraints, like restrictive covenants, would not generally affect value.
In the present case, the trial judge explicitly based his decision on the appraiser's finding that the property could be used for a combination of warehouses and offices. However, the property was not zoned for these uses. Since no evidence was presented to support the reasonable probability of a zoning change in the near future, we must find that the trial court acted unreasonably in accepting Groff's valuation of the property. As we said, such evidence may exist, but it is not in the record.
We also disagree that rejection of the Sabre appraisal means that the trial court must accept the $18,000,000 value assessed by the auditor. This value is clearly not supported by the record. On remand, the trial court may take additional testimony and decide an appropriate amount for the property's value.
Based on the preceding discussion, the second assignment of error will be sustained and this case will be remanded for further proceedings consistent with this opinion.
 III
In the third assignment of error, PPP claims that the AAA appraisal supports the sale prices of $67,500 and $75,000, i.e., AAA estimated Stouder's value as zero. Since this amount is close to the actual sales price, PPP believes the appraisal should have been accepted. The trial court did consider the AAA appraisal, but gave it little weight. In this regard, the court reasoned that the appraisal was prepared for UVMC's use in disposing of the Stouder and Piqua properties, not for tax assessment purposes. The court also remarked that the appraisal raised too many questions, particularly since the author was not available for questioning.
In response to PPP's argument, the BOE makes three points. First, the BOE says that the AAA appraisal was impermissible hearsay because the appraiser never appeared at the BOR hearing to testify. Second, the BOE claims the appraisal is flawed because the property was demonstrably worth more than zero. And finally, the BOE contends the report was defective because the valuation was not expressed as of the proper tax lien day, i.e., January 1, 1999.
As a preliminary matter, we note that administrative agencies do not have to follow the Rules of Evidence. See, e.g., Orange City School Dist. Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision (1996),74 Ohio St.3d 415, 417 (holding that the Rules of Evidence do not apply to the BTA). We have previously held that "[t]he hearsay rule is relaxed in administrative proceedings, but the discretion to consider hearsay evidence cannot be exercised in an arbitrary manner." Haley v. Ohio State Dental Bd. (1982), 7 Ohio App.3d 1, 6. Consequently, even if the AAA appraiser did not appear, the BOR could still have considered the report. Likewise, the BOR could have refused to admit the report. The real issue is whether the BOR abused its discretion.
After reviewing the record, we do not think the BOR acted arbitrarily. In the first place, the BOR did not reject the AAA appraisal because it was "hearsay." To the contrary, the BOR admitted the appraisal, but gave it little weight, partly because the appraiser was not made available to explain the content. The trial court made the same general observation. These were not objections to the truth of the appraisal. Instead, both the BOR and trial court focused on the lack of opportunity to explore discrepancies or questions about the appraisal. Notably, PPP could have presented testimony from the AAA appraiser at the BOR hearing, but chose not to do so.
BOE's second point is that the appraisal was invalid because the property was clearly worth more than zero. In this context, BOE points out that other purchase offers were received for all or parts of the property. However, the evidence cited by BOE about other purchase offers for the property relates to the Piqua property, not to Stouder. Therefore, this part of BOE's argument is not well taken. We do note that the actual sales price of the property exceeded the amount mentioned in the AAA appraisal. Whether the transaction was arms-length or not, the property was obviously not worthless.
Finally, we agree with BOE that the AAA appraisal did not properly establish value as of the tax lien date. The Ohio Supreme Court has said on various occasions that "the first day of January of the tax year in question is the crucial valuation date for tax assessment purposes." Freshwater, 80 Ohio St.3d 26, 29-30. Admittedly, the AAA appraisal is dated March 3, 1999, and the market probably did not change much during a two month period. Nonetheless, the date is incorrect and neither the BOR nor the trial court was required to accept it.
Under the circumstances, the trial court did not err in refusing to give weight to the AAA appraisal. Accordingly, the third assignment of error is overruled.
 IV
The final assignment of error challenges the trial court's decision not to let PPP present additional testimony. As we mentioned earlier, PPP wanted to present testimony from the AAA appraiser and from David Meckstroth, the UVMC president. In rejecting the request, the trial court focused on R.C. 5715.19(G), which provides that:
 [a] complainant shall provide to the board of revision all information or evidence within the complainant's knowledge or possession that affects the real property that is the subject of the complaint. A complainant who fails to provide such information or evidence is precluded from introducing it on appeal to the board of tax appeals or the court of common pleas, except that the board of tax appeals or court may admit and consider the evidence if the complainant shows good cause for the complainant's failure to provide the information or evidence to the board of revision.
Based on this statute, the Ohio Supreme Court has held that complainants who fail to submit all pertinent information to the BOR may not present the evidence on appeal, absent good cause. See, e.g, Coventry Towers, Inc. v. City of Strongsville, (1985), 18 Ohio St.3d 120, 121, and Sharon Village Ltd. v. Licking County Bd. of Revision (1997), 78 Ohio St.3d 479,482.
In rejecting the request for additional testimony, the trial court simply followed the applicable law. Significantly, PPP did not show good cause for failing to have the AAA appraiser testify before the BOR. In fact, the record is completely silent on why the appraiser was not called. On appeal, PPP focuses on the fact that further witnesses were needed to counteract the unexpected appraisal from Sabre. However, calling a witness to explain or clarify the AAA appraisal was not a defensive matter. Instead, this would have helped prove PPP's entitlement to a decrease in valuation.
Likewise, Meckstroth was not a defense witness. To the contrary, he would have testified about Stouder's value and the events surrounding the sale. The taxpayer has the burden of proving entitlement to a decrease in valuation, and "the auditor has no corresponding burden to defend its initial valuation until the taxpayer has presented credible, probative evidence of the right to a reduction." Murray Co. Marina, Inc. v. Erie Cty. Bd. of Revision (1997), 123 Ohio App.3d 166, 174. Since PPP chose not to call these witnesses, and did not establish good cause for its failure, PPP was barred from introducing their testimony on appeal. As a result, the trial court did not err in refusing to let PPP call additional witnesses.
Based on the preceding discussion, the first, third, and fourth assignments of error are overruled, and the second assignment of error is sustained. This case is, therefore, reversed and remanded for further hearing consistent with this opinion.
WOLFF, P.J., and FAIN, J., concur.